## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

**AMERICAN HOME ASSURANCE**
**COMPANY, a New York corporation**

      **Plaintiff,**

**v.**                                                     **Case No: 5:10-cv-329-Oc-10PRL**

**WEAVER AGGREGATE TRANSPORT,**
**INC., BEACON INDUSTRIAL**
**STAFFING, INC. and THE FARMERS**
**AND MECHANICS BANK**

      **Defendants/Third Party Plaintiff**

**SALVATORE MANZO and SALCOR**
**PROPERTIES, INC.**
      **Third Party Defendants**

### ORDER

    The Farmers and Mechanics Bank (the "Bank"), as Garnishee, has filed its Amended Answer to Writ of Garnishment and Demand for Setoff (Doc. 299) and requests that the Court enter an order providing that none of the monies in Defendant Weaver's account be subject to garnishment.   Plaintiff, American Home, who sought the garnishment, has responded to the Bank's motion and the Court's order to show cause.   (Doc. 320).   Thus, the Bank's motion is ripe for the Court's consideration.[1]   For the reasons explained below, the Bank's motion is due to be **DENIED**.

---

[1] Local Rule 6.01(c)(19), M.D. Fla, provides that magistrate judges are authorized to perform duties related to the "[c]onduct of all proceedings in civil suits, before or after judgment, incident to the issuance of writs of replevin, garnishment, attachment or execution pursuant to governing state or federal law, and the conduct of all proceedings and the entry of all necessary orders in aid of execution pursuant to Rule 69, Fed.R.Civ.P."

## I.     BACKGROUND

On July 22, 2010, American Home filed this action against Weaver and co-defendant Beacon.   (Doc. 1).   American Home sought recovery against Weaver on theories of breach of contract, unjust enrichment, open account, account stated, and fraudulent inducement.   Following a four-day trial, the jury found Weaver and Beacon jointly and severally liable to American Home for $404,013.   (Docs. 232 & 236).   Accordingly, American Home requested and the Court issued a writ of garnishment as to the Bank on October 3, 2014.   (Docs. 276 & 288).

The Bank filed an Answer to the writ of garnishment, claiming that at the time the writ was served upon Bank, the time of its answer, and all times between service of the writ and its answer, Weaver owed the Bank money pursuant to six different loans issued on May 23, 2014.   (Doc. 291).   The Bank demanded that the Court set off the money in Weaver's general deposit account against Weaver's obligations to the Bank.   Because the amount owed exceeded the amount in the account, the Bank claimed that none of the money should be subject to garnishment.

One month later, the Bank filed the instant motion.   (Doc. 299).   The motion was substantially similar to its Answer (Doc. 291), except that the Bank also claimed that it had a perfected security interest in the money in Weaver's account pursuant to a Commercial Security Agreement.   (Doc. 299-1).   The Court ordered the Bank to show cause why it should not deny the Bank's request.   (Doc. 301).

The Bank responded that it is entitled to a setoff on the grounds that: (1) it has a perfected security interest in the money in Weaver's general account; and (2) it believed Weaver's performance of the loan was impaired, the Bank was insecure with respect to the loan, and that the

loan was "in default upon the writ of garnishment being served" on the Bank.[2]   (Doc. 316).   In

support, the Bank attached the Business Loan Agreement (Doc. 315-2), Promissory Note (Doc.

315-3), and Commercial Security Agreement (Doc. 315-4) (collectively, the "Loan Documents"),

as well as the Corrected Affidavit of J. Michael Holloway, Senior Vice President of the Bank (Doc.

315).   Mr. Holloway is second in command at the Bank and handles Weaver's loan.   He claims

that "on or about October 8, 2014," the Bank was served with the writ of garnishment, and only

"at that time" did it become aware of American Home's judgment against Weaver.   (Doc. 315-1,

p. 2).

American Home replied to the Bank's Amended Response and the Court's order to show

cause (Doc. 320), noting that it deposed Mr. Holloway a few hours *after* receiving his affidavit.

(Doc. 320, p. 4).   American Home contends that Mr. Holloway's deposition testimony—that the

Bank declared Weaver's loan in default after being served with the writ on October 8—dooms the

Bank's claim.   (Doc. 320-2, p. 28).   In addition, American Home argues that the Bank's perfected

security interest does not "compel the conclusion that [the Bank] is entitled to a set-off."   (Doc.

320, p. 12).

## II.   DISCUSSION

In order for the Bank to secure a setoff, it must show that it has a perfected security interest,

and that the perfected security interest gives it priority in Weaver's account over American Home's

garnishment lien.   To establish its priority, the Bank must show that it declared the loan in default

and took affirmative steps thereafter to enforce its rights.   Because, as discussed below, the Bank

has failed establish that the loan was or is in default or, importantly, to enforce its rights as the

---

[2] The Bank had previously entered a Response to the Order to Show Cause at Doc. 304.   It submitted an Amended Response at Doc. 316.

lender, it is not entitled to the requested setoff, and its motion must be denied.   It is, as stated, the Bank's burden, but its burden has not been met.

The Court begins its analysis with whether the Bank has a perfected security interest and then addresses the issue of priority.

### A.      The Bank Has a Perfected Security Interest.

Before reaching the merits of this motion, the Court must first decide what law governs the security interest at issue in this case.   A choice-of-law clause in the Loan Documents requires that the Court apply federal law applicable to the Bank and, to the extent not preempted by federal law, Illinois law.   (Doc. 315-4, p. 5).   Florida choice-of-law rules govern the effect of this clause because a federal court in Florida exercising diversity jurisdiction applies Florida state law. *Liberty Mut. Ins. Co. v. Aventura Eng'g & Constr. Corp.*, 534 F.Supp.2d. 1290, 1302 (S.D. Fla. 2008).   A contractual choice-of-law provision is valid under Florida law: "[a]n agreement between parties to be bound by the substantive laws of another jurisdiction is presumptively valid, and this Court will enforce a choice-of-law provision unless applying the chosen forum's law would contravene a strong public policy of this State."   *Southeast Floating Docks, Inc. v. Auto–Owners Ins. Co.*, 82 So. 3d 73, 80 (Fla. 2012).   Because neither party argues that applying federal and Illinois law would contravene any public policy of Florida—let alone a strong one—the Court applies federal and Illinois law.[3]

As the Bank's interest in the deposit account arises under the Uniform Commercial Code ("U.C.C."), and as Illinois has adopted Revised Article 9 of the U.C.C., Article 9's choice-of-law provisions apply.   *See Joseph Stephens & Co., Inc. v. Cikanek*, 588 F.Supp.2d 870, 873 (N.D. Ill.

---

[3] Both parties appear to apply Florida law (the parties' briefs cite Florida cases), in contravention of the Governing Law provision in all of the Loan Documents.

2008).   Revised Article 9 provides that "the local law of a bank's jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in a deposit account maintained with that bank."   U.C.C. § 9-304; 810 ILCS 5/9-304(a).   In addition, § 9-304 provides rules for determining the bank's jurisdiction.   *See* 810 ILCS 5/9-304(b).   Relevant here is subsection (b)(1), which provides that "[i]f an agreement between the bank and the debtor governing the deposit account expressly provides that a particular jurisdiction is the bank's jurisdiction for purposes of this Part, this Article, or the Uniform Commercial Code, that jurisdiction is the bank's jurisdiction."   *Id.* at 5/9-304(b)(1).

As noted above, the Loan Documents' choice-of-law clauses provide that the Agreements will be "governed by federal law applicable to Lender [the Bank] and, to the extent not preempted by federal law, the laws of the State of Illinois."   (Docs. 315-2, p. 5, 315-3, p. 2, & 315-4, p. 5).   Thus, the Loan Documents suggest that Illinois is the "bank's jurisdiction" pursuant to U.C.C. § 9-304.   Accordingly, Illinois law governs perfection, the effect of perfection or nonperfection, and the priority of the Bank's security interest in a deposit account maintained with the Bank.

U.C.C. Revised Article 9 provides a comprehensive scheme for the regulation of security interests in personal property and fixtures.   *See* 810 ILCS 5/9-701.   Revised Article 9 does not apply to a right of recoupment or setoff.   *See id.* at 5/9-109(d)(10).   The Code provision governing the effectiveness of a bank's right of recoupment or setoff against a deposit account, however, *does* apply with respect to rights of recoupment or set-off against deposit accounts.   *See id.* at 5/9-109(d)(10)(A).[4]   Section 5/9-340 clarifies the nature of the bank's rights.   That section

---

[4] This provision constitutes an exception to the general exclusion of setoff rights from Article 9 under the former Code section on the subject by taking "account of the revised Article 9 section regulating the effectiveness of a setoff against a deposit account that stands as collateral."   33 Ill. Law and Prac. Secured Transactions § 53.

states that "the application of this Article [the U.C.C.] to a security interest in a deposit account does not affect a right of recoupment or set-off of the secured party as to a deposit account maintained with the secured party."   *Id*. at 5/9-340(b).   U.C.C. Comment 3 explains that "[s]ubsection (b) makes clear that a bank may hold both a right of set-off against, and an Article 9 security interest in, the same deposit account."   *Id.*   "By holding a security interest in a deposit account, a bank does not impair any right of set-off it would otherwise enjoy."   *Id.*

As a result, the Bank may request a right of setoff, provided it can show it has a perfected security interest in Weaver's deposit account.   Under Illinois law, a security interest in a deposit account may be perfected only by control under § 9-314.   *See id.* at 5/9-312(b)(1).   Under § 9-314, a security interest in a deposit account may be perfected by control of the collateral under § 9-104, *see id.* at 5/9-314, which states that a secured party has control of a deposit account if it is "the bank with which the deposit account is maintained."   *See id.* at 5/9-104.

Here, the Security Agreement denotes that Weaver's deposit accounts and money serve as collateral for the loan.   (Docs. 315-4, p. 1 & 316, p. 2).   As the Bank maintains Weaver's deposit account, the Bank has control of the collateral consistent with the Illinois law governing perfection. In addition, the Bank reserved a right of setoff in the Loan Documents.   (Doc. 315-4, p. 1).   Under these circumstances, the Court finds that the Bank has a perfected security interest in Weaver's deposit accounts.

American Home argues that even if the Bank has a perfected security interest, that "does not compel the conclusion that F&M Bank is entitled to a set-off."   (Doc. 320, p. 12).   To bolster its argument, American Home cites one Florida case, *Bank of Winter Park v. Resolution Trust Corp.*, 633 So. 2d 53 (Fla. Dist. Ct. App. 1994), which notes that the Florida Supreme Court may

not have intended for the priority provisions of Article 9 to apply to disputes involving a bank with setoff rights.

As the Court explained above, however, Illinois law—not Florida law—governs perfection, the effect of perfection, and the priority of a security interest in a deposit account maintained with that bank.   Thus, *Bank of Winter Park* has no bearing on the instant issues. Illinois's statutory provision at § 5/9-340(b) and the U.C.C. Comments show that Article 9 carves out an exception for a bank's setoff right as to a deposit account maintained with the secured party. Therefore, the Bank has a perfected security interest in the money in Weaver's account.   But a perfected security interest does not necessarily entitle the Bank to a setoff under Illinois law.   It must also show that it declared the loan in default and took affirmative steps thereafter to enforce its rights.   This the Bank cannot do.

> **B.    The Bank Failed to Declare the Loan in Default Before Being Served With the Writ of Garnishment.**

In this case, a key question is whether the Weaver loan was in default at the time the writ was served.   Despite statements in the Bank's Amended Response and Mr. Holloway's affidavit, Mr. Holloway's conflicting deposition testimony ultimately shows that it was not.

The Bank's Amended Response asserts three grounds for the default of Weaver's loan: (1) the prospect of performance of the loan was impaired; (2) the Bank was insecure with respect to the loan; and (3) the service of the writ of garnishment.[5]   (Doc. 316, p. 3).

---

[5] The Loan Documents list several Events of Default, including, in relevant part: (1) failure to make any payment when due under the Loan; (2) a garnishment of any of Borrower's accounts, including deposit accounts, with Lender; (3) a material adverse change in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired; and (4) the Lender in good faith believes itself insecure.   (Docs. 315-2, pp. 4-5, 315-3, p. 1, 315-4, pp. 3-4).

1.    *Impaired Performance and Bank's Insecurity*

The Court will consider the first and second grounds together, as they were allegedly caused by the same event: the entry of the judgment against Weaver on February 3, 2014.[6]   The Bank's argument that the entry of the judgment is an event of default which caused it to believe the loan was impaired or that it was insecure is unavailing.   The judgment occurred months before the parties executed the Loan Agreement on May 23, 2014; under the Bank's nonsensical analysis, Weaver would have defaulted on the loan the moment it signed the Agreement.   Mr. Holloway reveals that, not only did the Bank fail to perform any due diligence to discover the judgment prior to issuing the loan, it further failed to investigate Weaver's financial condition *after* learning of the judgment in October.   (Doc. 320-2, pp. 23-26).

Specifically, Mr. Holloway testified that as of his December 4, 2014 deposition, he did not have the "full picture" of Weaver's financial situation, even though the Bank received the writ on October 8, 2014.   (Doc. 320-2, p. 28).   Further, Mr. Holloway stated that he did "not know for sure" that Weaver's prospect for performance of the loan was impaired.   (Doc. 320-2, p. 26).   He also never conclusively stated that he, a senior vice president at the Bank and the person in charge of the Weaver loan, believed that the Bank was insecure with respect to the Weaver loan.   His most definitive statement was that he had "serious concerns about it" and he said "I don't know that right now, and I don't know what I don't know."   (Doc. 320-2, pp. 21-22).   The discovery of a prior judgment is not an event of default under the Loan Documents, nor does the Bank make that claim; what the Bank argues is that discovering the judgment through the writ made it feel insecure and that Weaver's performance of the loan was impaired.   Thus, Mr. Holloway's

---

[6] The Bank argues that the entry of the judgment, which occurred on February 3, 2014 (Doc. 236) but which the Bank only learned of on October 8, 2014, is an event of default under the Loan Documents. (Doc. 316, p. 3).

deposition shows that, as of his December deposition, the Bank could not definitively state that the Weaver loan was impaired or the Bank felt insecure as to the loan—two critical points supporting its argument of default—despite stating the contrary in Mr. Holloway's affidavit and its Amended Response.

2.    *Writ of Garnishment*

The Bank's other argument, that service of the writ of garnishment constituted a second event of default, is also unavailing.   (Doc. 316, p. 3).   While it is true that the "garnishment of any of Borrower's accounts" is an event of default under the Loan Documents (Doc. 315-2, p. 5), the assertion that "it is evident that the Loan was in default at the time the writ of garnishment was served" (Doc. 316, p. 4) is not as straightforward as the Bank suggests.   The evidence does not show that the loan was in default *at the time* the writ of garnishment was served.   Moreover, as Mr. Holloway's testimony demonstrates, it is unclear that the loan was ever considered in default due to a crucial distinction the Bank makes between monetary and non-monetary default.

According to Mr. Holloway, a monetary default is a default based on non-payment.   (Doc. 320-2, p. 15).   Under the Bank's policy, a monetary default is self-executing and requires no affirmative decision by the Bank to declare a loan in default.   *Id.*   Either a borrower makes its payments or it does not.   In contrast, non-monetary defaults, which include the events alleged here, require the Bank to take affirmative steps to evaluate and decide whether a loan is in default. (Doc. 320-2, pp. 14-16).

Weaver was current with its monthly interest payments, and thus, not in monetary default pursuant to Bank policy as explained in Mr. Holloway's deposition.   (Doc. 320-2 p. 14).   Indeed, Mr. Holloway stated that "payments were being made on time, and they [Weaver] were meeting their covenants."   (Doc. 320-2, p. 20).   Mr. Holloway testified that he made the determination

that Weaver had suffered a material adverse change in its financial condition, such that the Bank deemed the loan in default, "as soon as [he] saw a $400,000 garnishment sitting on [his] desk." (Doc. 320-2, p. 18).   However, no written documents show that Weaver's financial condition changed, and, as discussed above, the Bank conducted no due diligence after discovering the judgment and garnishment to understand Weaver's current financial status.   Mr. Holloway testified that, while he was "not sure [of] the exact date," the Bank decided to declare Weaver's loan in default "*after* October 8th, obviously."   (Doc. 320-2, p. 27) (emphasis added).

At the deposition, American Home specifically questioned Mr. Holloway regarding the steps he took after making a determination that Weaver had suffered a material adverse change in its financial condition, such that the Bank made a decision to deem the loan in default.   (Doc. 320-2, p. 17).   When asked whether he "made a notation that the loan is now in default," Mr. Holloway said that all he "did was contact the bank's attorney after talking to our bank president." (Doc. 320-2, p. 18).   Apparently, no such notation was made.   Although the Bank has a loan committee, he did not advise anyone else that the loan was now in default—apparently not even Weaver, though Mr. Holloway spoke with Mr. Weaver after receiving the writ and "asked him what it was about."   (Doc. 320-2, p. 9).   Further, Mr. Holloway stated that Weaver's loan "could be classified as a watch list loan" in a future report to the Federal Reserve or Illinois regulators; he did not commit to classifying the loan as "nonperforming."   (Doc. 320-2, p. 21).

American Home filed an errata sheet that Mr. Holloway signed two weeks after his deposition.   (Doc. 320-3, p. 3).   In it, Mr. Holloway claimed to merely "elaborate" on his deposition answer, adding that "the default occurred when the writ of garnishment was served [on October 8] on the Bank, because it is an event of default under the loan documents."   (Doc. 320-3, p. 33).   The Bank has made no effort to rely on the new, "elaborative" information in the errata

sheet (or Mr. Holloway's deposition testimony, for that matter)—American Home merely argues preemptively that the Court should reject any such attempt by the Bank.   (Doc. 320, pp. 7-10).

Although the Bank relies only on its Amended Response and Mr. Holloway's affidavit, the Court finds the Bank's final attempt to alter the timeline through the errata sheet telling.[7]   Because the Court concludes that Mr. Holloway's answers in his deposition do not reflect any obvious confusion that would justify the material alternations the errata sheet attempts to make to his original testimony, the Court will disregard the amendments to Mr. Holloway's testimony.   *See Reynolds v. Int'l Bus. Machines Corp.*, 320 F. Supp. 2d 1290, 1301 (M.D. Fla.) aff'd sub nom. *Reynolds v. IBM*, 125 F. App'x 982 (11th Cir. 2004) (disregarding amendments to deposition testimony that did not reflect obvious confusion justifying the material alterations in the errata sheet).

As American Home points out, the three cases the Bank's relies on to support its demand for a setoff are materially distinguishable, and the Court notes that they rely on Florida (not Illinois) law.   In *American Alternative*, the court found that, because payments due had not been made, the note was in default without the need for bank action, and the writ of garnishment was properly dissolved.   *Am. Alternative Ins. Corp. v. S. Florida Glazing, Inc.*, 904 So. 2d 656, 657 (Fla. Dist. Ct. App. 2005).   Here, Mr. Holloway confirmed that Weaver was current with its interest payments.

---

[7] As American Home points out in its Reply (Doc. 320), the Court notes that the Bank has altered the timeline of when it became aware of the judgment and when it declared the loan in default several times in the various documents submitted to and withdrawn from the Court.   Although the Court is not considering the documents the Bank has amended and withdrawn, the shifting narrative is relevant in that the Bank has inexplicably changed the timeline multiple times and has offered little evidence of actions taken to declare the loan in default and no evidence showing any subsequent actions taken to freeze the account or collect the money allegedly due and owing.

In *Barsco*, the debtor defaulted prior to the service of the writ by selling two cash registers named in the inventory attached to the security agreement without notifying the garnishee and failed to insure the collateral as required by the agreement.   *See Barsco, Inc. v. H.W.W., Inc*. 346 So. 2d 134, 135 (Fla. Dist. Ct. App. 1977) (affirming decision that the garnishee bank, which held a note which had not matured, but was otherwise in default at the time of the service of a writ of garnishment, could prevail over judgment garnishor).   Here, unlike *Barsco*, whether the loan was in default at the time the writ was served is a key question.

*Matter of T & B Gen. Contracting Co., Inc*., 13 B.R. 686 (Bankr. M.D. Fla. 1981) presents, perhaps, the most compelling argument for the Bank.   There, the court determined that an entry of judgment constituted a default and that "priorities are not determined by whether the service of the writ [of garnishment] precedes the election to set-off."   *Matter of T & B*, 13 B.R. at 688.   In *T & B*, however, the debtor's default under the security agreement triggered the maturity of the obligation.   In contrast, the alleged default in the instant case could not have occurred, according to Mr. Holloway, until the Bank took steps to evaluate the Weaver loan and declare it in default. Such is the Bank's self-proclaimed procedure in cases of non-monetary default like the one under review.   Thus, this case is materially distinguishable from *Barsco*, where the default occurred prior to service of the writ, and *T & B*, where the judgment triggered the default prior to service of the writ.

In each of these cases, the debtor defaulted on the loan prior to the service of the writ of garnishment—not concurrently with or upon service, as the Bank contends, or after service, as American Home contends.   While the parties have pointed to no Florida cases—much less Illinois cases—on this issue and the Court has found none, there is persuasive authority from other states holding that a bank had no right to setoff against the debtor's account prior to the moment the writ

of garnishment was issued.   In *In re Petraglia*, 156 B.R. 474, 476 (Bankr. W.D. Pa. 1993), the bank argued that it was entitled to exercise its right to setoff because default occurred contemporaneously with the issuance of the writ of garnishment.   Denying the bank's motion for setoff, the court found that the bank had no right to setoff against the accounts "prior to that moment."   *Id.* at 476.   In fact, the garnishment "primed [the bank's] right to setoff."   *Id.* Without issuance of the writ of garnishment, default would not have occurred—the writ of garnishment triggered the default, even though the two events may have occurred simultaneously.

Here, the Bank was not even aware of the judgment against Weaver until receiving American Home's writ of garnishment.   Thus, as in *Petraglia*, the receipt of the writ of garnishment "primed" the Bank's right to setoff.   Because the Bank, however, had not yet declared the loan in default per its policy on non-monetary defaults, similar to the situation in *Petraglia*, here "the garnishment [was], in the appropriate legal sense 'prior to' the default."   *Id.*

### C.     The Bank's Failure to Declare the Loan in Default Undermines its Setoff Request.

Having found that the Bank has a perfected security interest in the loan but declared the loan in default at some point (it remains unclear exactly if and when the loan was declared in default) after receiving the writ, the Court turns to the effect of these circumstances on the parties' priority in the money in Weaver's deposit account.

The Bank bears the burden of proving that its interest in the funds trumps American Home's garnishment lien.   *See S.E.I.U. Local No. 4 Pension Fund v. Pinnacle Health Care of Berwyn LLC*, 560 F. Supp. 2d 647, 649 (N.D. Ill. 2008) (citing *Liberty Leasing Co., Inc. v. Crown Ice Machine Leasing Co., Inc*., 311 N.E.2d 250, 251-52 (Ill. App. 3d 1974)).   In ruling on cases involving the priority of perfected security interests and judgment liens, federal courts in Illinois

applying U.C.C. and Illinois law have encountered cases virtually identical to the instant one, and have held in favor of the party seeking to enforce a judgment.

In *S.E.I.U.*, the plaintiff sought to enforce a judgment against Pinnacle by recovering funds due to Pinnacle from the Illinois Department of Healthcare and Family Services.   *Shales v. Pipe-Liners, Ltd.*, No. 09-CV-1822, 2012 WL 4793499, at *2 (N.D. Ill. Oct. 9, 2012) (citing *S.E.I.U.*, 560 F.Supp.2d at 648).   Premier Bancorp intervened, claiming that its undisputed, perfected security interest in the funds had priority over SEIU's judgment lien.   *Id.*   As in the instant case, the plaintiffs deposed the intervenor's vice president of lending, the most knowledgeable person regarding the loans.   The *S.E.I.U.* court specifically noted that the vice president was "not able, or perhaps unwilling, to testify as to whether Pinnacle was in default of its obligations to Premier," and that at the deposition, the vice president simply responded "I don't know" to any and all questions related to the status of Pinnacle's loans.   Despite the opacity of the vice president's responses, based on language in the security agreement, the court concluded that Premier "only takes on the rights of a secured creditor under the U.C.C. after a default occurs."   *Id.* Accordingly, the court found that Premier Bancorp had a security interest on Pinnacle's assets upon two conditions: (1) a default had to occur, and (2) Premier Bancorp had to take an affirmative step to exercise its rights.   *Id.*   The court concluded that, "despite the fact that Pinnacle may have technically defaulted on its loan, because Premier did not declare Pinnacle's loan in default or follow procedures required by the Security Agreement to enforce its U.C.C. and contractual rights, Premier does not have a present right to the funds nor a basis on which to object to their release." *Id.*

Similarly, in *One CW, LLC v. Cartridge World North America, LLC,* 661 F.Supp.2d 931 (N.D. Ill. 2009), the plaintiff sought to enforce a judgment against Midwest, in part, by recovering

funds in Midwest's account at Signature Bank.  *Id.* at *3.  Signature Bank claimed that its undisputed, perfected security interest in the funds had priority over One CW's judgment lien.  *Id.* The security agreement in question contained the same language as the one in *S.E.I.U.*  *Id.* Unlike in *S.E.I.U.*, however, in *One CW*, the bank declared the loan in default on the day that it was served with a citation.  *Id.*  Still, the court found that Signature Bank had not taken affirmative steps thereafter to enforce its rights to Midwest's assets.  *Id.*  Accordingly, the court followed *S.E.I.U.* in finding that the bank could not object to the plaintiff's demand for the funds in question. *Id.*

The circumstances in this case are virtually identical to those of *S.E.I.U.* and *One CW*. The Loan Documents involve the same language—apparently prevalent boilerplate language for security agreements in Illinois.[8]  As in *S.E.I.U.*, the Bank enjoys rights in Weaver's account pursuant to the Security Agreement executed between them.  *See S.E.I.U.*, 560 F.Supp.2d at 650. The agreement entitles the Bank to exercise its rights in the collateral, including Weaver's account, in the event of a default, but gives Weaver possession and beneficial use of the collateral until default.[9]  The Security Agreement allows the Bank to exercise rights of collection and notification at any time,[10] but, as in *S.E.I.U.*, those rights are distinct from those to which the Bank is entitled

---

[8] Mr. Holloway testified that much of the language in the Loan Documents is boilerplate and was not customized for Weaver.  (Doc. 320-2, pp. 11-12).

[9] "Until default and except as otherwise provided below with respect to accounts, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement to the Related Documents, provided that the Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral."  (Doc. 315-4, p. 3). Identical language appears in *S.E.I.U* and *One CW*.  *See S.E.I.U.*, 560 F.Supp.2d at 650; *see also One CW*, 661 F.Supp.2d at 934.

[10] "At any time and even though no Event of Default exists, Lender may exercise its rights to collect the accounts and to notify account debtors to make payments directly to Lender for application to the Indebtedness."  (Doc. 315-4, p. 3).  Identical language appears in *S.E.I.U.*  *See S.E.I.U.*, 560 F.Supp.2d at 650.

to exercise in the event of default.[11]   As in *S.E.I.U.*, the Security Agreement between the Bank

and Weaver makes clear that the Bank only takes on the rights of a secured creditor under the

U.C.C. after a default occurs.   Default, therefore, is the essential prerequisite, and in the absence

of such, the Bank cannot seize the collateral and apply it against the loan or otherwise prevent

another creditor of the debtor—such as American Home—from taking possession of the collateral.

*See S.E.I.U.*, 560 F.Supp.2d at 650 (citing *Martens v. Hadley Mem'l Hosp.*, 729 F.Supp. 1391,

1393-95 (D.D.C. 1990) (holding secured creditor's priority did not suffice to quash writ of

attachment where creditor never declared default and absent "the good faith execution of the

affirmative remedies such as acceleration, provided in the loan document")).

Circuit courts have rejected banks' arguments that a perfected security interest

automatically gave them priority over a judgment creditor.   *See id.* (citing *Frierson v. United

Farm Agency, Inc.*, 868 F.2d 302 (8th Cir. 1989).   The *S.E.I.U.* court noted that, in *Frierson*, the

trial court stated and the Eight Circuit agreed:

> Most secured loans provide for numerous events which constitute default, many of which
> are technical in nature and are inserted in the loan documents to enable the lender to declare
> the note in default when even a relatively minor problem arises with the loan or the debtor.
> Thus, at any given time many secured loans are technically in default, but are never treated
> as such by secured creditors. In addition, a secured party will occasionally ... ignore a
> default which is more than just a technical default. If a secured creditor with a security
> interest over all the debtor's property is permitted to rely on default, whether technical or
> not, to prevent another creditor from executing on the debtor's property, while treating the
> loan as not in default when dealing with the debtor and others, severe inequities would
> result.... Such an approach would be against both the spirit and the letter of the Uniform
> Commercial Code.

---

[11] "If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the
rights of a secured party under the Illinois Uniform Commercial Code. In addition and without limitation,
Lender may exercise any one or more of the following rights and remedies: [list includes acceleration of
the debt, obtain deficiency judgment, among others]."   (Doc. 315-4, p. 4).   Identical language appears in
*S.E.I.U*.   *See S.E.I.U*., 560 F.Supp.2d at 650.

*Frierson*, 868 F.2d at 304-05.

As noted above, the court in *S.E.I.U.* found that, while the bank had a prior perfected security interest in the collateral and despite the fact that the borrower technically defaulted on the loan, because the bank did not declare the loan in default or follow procedures required by the security agreement to enforce its U.C.C. and contractual rights, the bank did not have a present right to the funds, nor a basis on which to object to their release.   *S.E.I.U.*, 560 F.Supp.2d at 651.

Here, while the Bank claims to have declared the loan in default, it must have done so after receiving the writ of garnishment, and has provided little evidence of having done so at all.   The Court agrees with the Eighth Circuit that the Bank cannot "refuse to exercise its rights under the security agreement, thereby maintaining [the debtor] as a going concern, while it impairs the status of other creditors by preventing them from exercising valid liens. . . .   [T]o do so would fly in the face of all of Article 9, which is premised on the debtor's ability to exercise rights in the property." *Frierson*, 868 F.2d at 305.   The Court finds that the nearly identical circumstances in this case militate in favor of the same result as in *S.E.I.U.*

Moreover, even if this case was more comparable to *One CW*, where the bank declared the loan in default "on the day" the bank was served with the citation, the same result would prevail. The *One CW* court found persuasive other cases in which the "mere declaration of a default in the absence of other affirmative remedial action, such as the acceleration of the loan, does not entitle the secured party to take possession of the collateral."   *One CW,* 661 F.Supp.2d at 935 (citing *Martens*, 729 F.Supp. 1394).   In addition, the court found that, although the bank claimed a right to setoff, it failed to take any steps to actually exercise this right.   *Id.* at 936.   For example, the bank had not frozen the assets in the account, which was a violation of the garnishment procedures and an indication that he bank had no intention of actually exercising its right to setoff.   *See id.*

- 17 -

Courts have also found that while a bank may have taken steps to exercise its rights as a secured party, it may not have done "enough to preserve its rights."   *See Shales*, 2012 WL 4793499, at *3 (finding that a bank that merely sent a letter demanding payment for notes that had already matured did not do enough to preserve its rights in collateral).   Those courts have concluded that the bank failed to meet its burden on the priority issue.   *Id.*

Here, the Bank has had ample opportunity in its Answer, its Response to the Order to Show cause, its Amended Response, and its various affidavits to inform the Court of the steps it has taken to exercise its rights under the Loan Documents.   However, the filings and deposition testimony reveal that the Bank's only steps have been to speak to the Bank's president and attorney, and that the Bank declared the loan in default *after* receiving the writ.   As a result, the Court finds that although the Bank has a prior perfected security interest, it is not entitled to a setoff.

### III.    CONCLUSION

Thus, the Bank's motion for a setoff (Doc. 299) is **DENIED**.


**DONE** and **ORDERED** in Ocala, Florida on February 2, 2015.

PHILIP R. LAMMENS
United States Magistrate Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties